Filed 11/26/19; Certified for publication 12/10/19 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MARLIN ROYAL,<br><br>    Defendant and Appellant. | D074343<br><br><br><br>(Super. Ct. No. SCE361596) |

APPEAL from a judgment of the Superior Court of San Diego County, Jeffrey F. Fraser, Judge.  Affirmed.

Randall Bookout, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting, and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

After the jury deadlocked and the trial court declared a mistrial, a second jury was empaneled and then it convicted Marlin Royal of first degree murder (Pen. Code,[1] § 187). The jury also found true that Royal personally used a firearm in the commission of the murder (§ 12022.5, subd. (a)) and intentionally discharged a firearm causing death (§ 12022.53, subd. (d)). Royal subsequently admitted a serious felony prior (§ 667, subd. (a)(1)) as well as two prior strikes (§ 667, subds. (b)-(i)). The court sentenced Royal to prison for 100 years to life, plus five years.

Royal appeals, contending: (1) the prosecution did not exercise due diligence in securing the key witness to testify during Royal's second trial (leading the prosecution to read the transcript of the witness's testimony at the second trial); (2) the trial court erroneously admitted hearsay evidence as past recollection recorded; and (3) the trial court improperly limited the scope of the cross-examination of the prosecution's expert witness.

Although we conclude the trial court erred in admitting certain evidence under the past recollection recorded exception to the hearsay rule, we determine such error to be harmless. Additionally, we find Royal's other claims of error without merit. We therefore affirm the judgment.

---

[1] Statutory references are to the Penal Code unless otherwise specified.

FACTUAL BACKGROUND

*Prosecution*

On May 7, 2007, at around 10:15 p.m., a man left his house on Millar Ranch Road to meet his friend at a nearby restaurant. As he drove down Millar Ranch Road, he had to swerve to avoid striking an object in the road. Because the object resembled the lower half of a person, the man called 911. As he was calling 911, a car with three women pulled up next to him. The driver of this other vehicle, who appeared Middle Eastern or Hispanic, seemed confused or nervous and asked the man if he had seen anything in the road. When the man informed her that he had, and that he was on the phone with 911, the women drove off in the direction from which the man came.

At 10:25 p.m., a San Diego County Sheriff's Deputy was dispatched to the scene. The responding deputy found the victim, R.J., lying partially in the bushes. Part of his brain and skull fragments were scattered in the road by his feet. Paramedics pronounced R.J. dead at the scene.

A lighter, cigarette butt, gum wrapper, and saliva were found near the victim's body. The victim's wallet contained only a quarter.[2]

An autopsy revealed that R.J. died from a shotgun blast to the head. The fatal shot was likely fired from within three feet. There was methamphetamine in his system. Based on the evidence recovered at the scene, a criminalist stated the shotgun shell used to kill R.J. was most likely "a Remington shot shell of .12 gauge caliber containing No. 6

---

[2]     Evidence adduced at trial showed that, before his death, R.J. recently had been seen around the neighborhood flaunting several thousand dollars.

3

shot."  The criminalist believed that Remington had likely sold hundreds of millions of shotgun shells in the past 25 years, and she acknowledged the shell that killed the victim could have come from any 12-gauge shell with number 6 shot with similar manufacturing characteristics.  The criminalist also testified that it could be possible that other manufacturers could use Remington components such as wadding inside their own shells, so that the shell that killed the victim potentially could have come from any number of manufacturers.

The victim's cell phone, found underneath his body, provided investigators with certain information regarding where the victim was leading up to his death.  R.J. had last been seen alive in a parking lot by Wrigley's Supermarket on Euclid Avenue near his home.  Cell tower records confirmed his phone had been in that area.  These records showed the victim's cell phone, and a cell phone with the number (310) 693-3741, moving in the same direction toward the crime scene.  The 310 number belonged to Royal.

Investigators examined R.J.'s call logs.  R.J. had called several people on May 7th including his father, sister, and girlfriend.  R.J. had placed four outgoing calls to Royal's number around 11:30 a.m.  Cell data indicated the calls were placed from a tower in National City near his home.  At 1:59 p.m. and 2:58 p.m., R.J. placed two more calls to Royal's phone.  R.J. again called Royal at 7:59 p.m.  A call made from the victim's phone at 9:06 p.m. connected to a different cell tower than the previous calls, indicating that R.J. might have been moving.  The victim made several more calls between 9:32 p.m. and

4

9:40 p.m. These calls utilized a cell tower by Jamul and Rancho San Diego, near where R.J.'s body was found.

On the night he was killed, R.J. exchanged several flirtatious texts with a female friend between 8:03 p.m. and 8:24 p.m. He never responded to a follow up text she sent him at 8:45 p.m., which was unusual. Sometime between 8:30 p.m. and 9:00 p.m., R.J. called one of his friends looking for his girlfriend. The friend detected nothing unusual about R.J.'s voice.

Royal's phone records from the day of R.J.'s death also were analyzed. His phone had called numbers associated with his mother, stepfather, a landline registered in his stepfather's name, and a landline registered to a woman living with him. Royal's phone also had been used to call a "Livelinks/phone sex" hotline. Phone records also showed a call from a pay phone off of Jamacha Road to Royal's mother's number on the night R.J. was killed. Royal's mother's cell phone also had called a Ralph's grocery store around the time of R.J.'s death. The last call between Royal and his mother occurred at 1:00 a.m. on May 8.

At around 8:30 p.m., Royal's phone had been connected to a cell tower in National City. After that, his phone had connected to the tower by Jamul and Rancho San Diego. There were no calls between 8:31 p.m. and 10:18 p.m.

Royal's friend introduced him to R.J. R.J.'s nickname was "Snake," and he occasionally engaged in minor scams. For example, he once sold a friend a phone for $50 that did not have a working home button. Before his death, R.J. was using methamphetamine and losing weight.

5

On the day he died, R.J. received a phone call, after which he said, "Oh, I just need to go take care of something. I'm meeting somebody at Wrigley's." He also changed into nicer clothes. His girlfriend asked him who he was meeting but he did not say, mentioning that the person he was meeting told him not to bring her along because "they were about to go handle man business." R.J. sometimes served as a middleman in drug transactions, matching up a seller and buyer in return for a cut of the drugs.

When R.J. left for Wrigley's, his girlfriend followed him for a short while. However, R.J. told her to wait for him at another friend's house, where she ended up sleeping that night.

L.N. was a key prosecution witness. She testified during Royal's first trial, but did not do so in the second. Instead, a transcript of her testimony was read to the jury during the second trial.

L.N. met Royal when she was 24 or 25 years old. The couple began dating and remained in a relationship for about eight years. After dating for six months, Royal persuaded L.N. to begin prostituting herself. She gave the money she earned as a prostitute to Royal. However, Royal became violent with L.N., beating her on multiple occasions, which resulted in several hospital stays.

In separate incidents, Royal's two vehicles were shot up. One night, L.N. saw Royal putting a shotgun into his pants. Royal normally kept the shotgun under his bed. Royal was upset that his vehicles had been shot up. Later that night, Royal called L.N. and told her he needed to be picked up at a supermarket. L.N., Royal's mother, and Royal's stepfather drove to pick up Royal at the supermarket off of State Route 94. After

6

they picked him up, Royal told them he had murdered someone. Royal explained that he had asked R.J. who had shot at his car. R.J. refused to tell him and was pleading for his life. Royal told R.J. he would give him "one more chance." After "the victim said he couldn't tell him . . . everything went silent."

Royal did not have the shotgun when he got back to the car. Around 2:00 or 3:00 a.m., Royal left to find the gun.[3] When he returned, Royal and L.N. went to a diner in Mission Valley. They stayed there until early morning and then went to Royal's grandfather's house. There, they saw a television broadcast about R.J.'s murder. When Royal saw the news story, he announced, "That's it. That's him."

Royal and L.N. then went to Texas for a few days before returning to San Diego. A few weeks later, Royal and L.N. decided to drive to Missouri. As they were passing through Arizona, they were pulled over by law enforcement. An Arizona police officer found a box of shotgun shells in the trunk of Royal's car. These shotgun shells were Remington 12 gauges with No. 6 shot. L.N. also had a small amount of drugs in her purse. After the Arizona incident, the couple's relationship ended, and L.N. moved to Georgia to live with family.

In 2013, detectives contacted L.N. in Nevada. She initially denied having information about the murder, but in a second interview, she admitted that Royal had confessed to committing the crime. She added that the shooting might have been related

---

[3]    A detective was at the crime scene until 4:08 a.m., and there is no indication in the record the detective saw Royal return to the area.

to Royal's car getting shot up. L.N. also informed the detectives that a lot of men were angry with Royal because he had pimped their girlfriends or wives.

L.N. also claimed that Royal made her call R.J. multiple times to get him to meet her at Wrigley's. She denied that she was arranging to meet R.J. for paid sex. L.N. was "deathly afraid" of Royal.

Additionally, L.N. told the detectives that "there might be an association between [an individual identified as] Ali and one of the [car] shootings . . . ." Royal and Ali had formerly worked together at NASSCO. Royal and Ali went to Los Angeles together, where Ali got arrested for a parole violation because he had left San Diego County. At some point before the murder, Royal beat up Ali, apparently because he thought Ali was involved in one of the car shootings. According to one of the detectives, regarding R.J.'s death, L.N. "suggested that [Ali] might be somehow involved or a reason why."

The prosecution also called a clinical social worker as a sexual trafficking expert. She testified that women who are trafficked and abused commonly suffer from memory loss and disassociation.

*Defense*

Kenneth Stewart, the lead investigator assigned to the case, testified that L.N. avoided cooperating with the investigation. In 2015 and 2016, it took Stewart almost a year to locate and serve her with a subpoena. L.N. testified at the preliminary hearing in December of 2016 and the first trial in September of 2017. Before her September testimony, she was informed that the defense planned to argue that she had committed the murder. This upset her, making her more fearful and less cooperative.

8

A few weeks before the second trial began, in March 2018, L.N. called the prosecutor and told her she would not come to court, give up her location, or cooperate. Stewart believed that L.N. had moved from Nevada to Georgia.

L.N.'s attorney testified at Royal's second trial. He testified that L.N. had contacted him in the last ten days. L.N. told him to present the prosecutor with a list of demands if she was to testify. She wanted immunity from prosecution for R.J.'s murder, her mother to be left alone, and $15,000.

The parties also stipulated that L.N. had attempted to invoke her Fifth Amendment right not to testify in the first trial. The trial court, however, had ruled that she had no Fifth Amendment right because her testimony "did not incriminate herself and implicate the Fifth Amendment."

Royal testified in his defense. He claimed he did not have anything to do with R.J.'s murder. He met L.N. on a Livelinks phone sex hotline. She was already prostituting herself, but Royal decided to act as her pimp to "show her the correct way to do it." Royal also was pimping another woman in Los Angeles. Royal stated that he wanted to help L.N. prostitute herself in a safe manner, but admitted he had beaten her up on two occasions.

According to Royal, L.N. "became a very ruthless, very conniving, deceiving prostitute." In 2005, Royal quit pimping and began working at NASSCO. He claimed that he obtain "a lot of certifications" while at NASSCO, including certified sheet metalist, crane operator, electrician, and pipefitter. He denied he started at NASSCO as a

9

student pipefitter and left as a pipefitter trainee. In 2006, Royal left NASSCO because he was devoted to his other two jobs, a cell phone business and a printing business.

Royal testified that he made over $100,000 a year from his two companies. However, he admitted that he did not always pay his bills. L.N. helped Royal with the administrative work for the cell phone business. He also admitted the (310) 693-3741 phone number was his and his business cards included that number. He stated that the number was "important," and he chose the 310 area code because "310 was like a nice neighborhood, Beverly Hills," and he wanted the business to be associated with wealth.

On November 6, 2006, Royal took his friend Ali, to Los Angeles. Ali was detained in Los Angeles and found to be in violation of his parole. Ali ended up going back to prison and blamed his misfortune on Royal. When Ali got out of custody, he arranged for "three assassins" to shoot up one of Royal's vehicles.

One of Royal's friends introduced him to R.J. Royal and R.J. hung out about 10 times. Royal knew that R.J. had a methamphetamine problem. He employed R.J. as a telemarketer.

According to Royal, he gave L.N. the phone with the 310 area code on May 7 and told her to give to it R.J. so he could use it to make cold calls. Royal explained that he decided to give this phone to R.J. because "the 310 number was kind of like a phone [he] didn't really care about."

On May 7, Royal got home from work around 3:00 or 3:30 p.m., and went out with one of the women he was seeing. He returned home around "11:00ish, somewhere

10

around there, at nighttime." L.N. was not home when he got home, which was unusual. Royal became upset because he thought L.N. was cheating on him.

At 11:15 p.m., L.N. called Royal from the supermarket acting nervous and timid. Royal was "highly upset" when she told him she had not given the phone to R.J. like he had told her to do. Royal claimed the series of calls from his phone to his mother and stepfather were a subsequent "huge argument" between him and L.N. According to Royal, they argued and hung up on each other, and he changed phones as he walked around his house. Royal also explained that the call at 11:39 p.m. to the supermarket from his mother's phone occurred because he did not believe that L.N. had been calling from the supermarket and wanted to see if she was actually there.

Royal did not see L.N. until the following morning around 6:00 or 7:00 a.m. She was still carrying Royal's phone, but Royal did not know what she did with it. Royal did not go to a diner in Mission Valley or his grandfather's house.

Royal admitted he suffered from a "terrible record" that included three prior robbery convictions and an assault conviction. He also admitted to beating L.N. on two occasions. He beat her the first time because she was "lying" and "difficult." The second time he beat her because she gave him food poisoning. L.N. had lied to Royal about her stepfather sexually abusing her.

Royal claimed he had never had any firearms at his mother's house, and that he did not have access to his stepfather's firearms. He also testified, "I don't think I knew they was in there," when asked about the shotgun shells found by Arizona police in his car.

11

Royal's mother testified that while L.N. was living with Royal she came and went as she pleased and did not appear to be afraid of leaving the house. During this time, L.N. would visit her own family. L.N. drove a white compact car and never appeared to be afraid of Royal.

Royal did not have a gun in the house, and his mother was adamant she would have found it if he did. Both Royal and L.N. had separate cell phones, and there were separate landlines in Royal and L.N.'s bedroom and in the kitchen. Royal's mother would leave her own cell phone in various locations whenever she was at home; her husband would leave his cell phone in a charger at night and would not have known if anyone used it.

Royal's mother also claimed she did not drive to pick up Royal from Spring Valley in May of 2007, and that she never heard him say he had killed someone.

Royal's stepfather had triple bypass surgery in April of 2006 and experienced a significant recovery period, which included being hospitalized with pneumonia. According to him, there was no way he could have driven to Spring Valley in May 2007 to pick up Royal. He likewise was confident he did not hear Royal confess that he had killed anyone. He owned a shotgun and many other guns, but kept them locked up.

A defense investigator testified that Royal's mother expressed frustration with the fact that L.N. stopped running Royal's businesses and was not generating money for his legal defense.

A defense crime scene analyst testified that he could not definitively establish whether the victim was standing, kneeling, or ducking when he was shot. There was

12

dried grass and dirt on the victim's back, which could not have been there had the victim been shot from behind while kneeling execution-style and fallen straight forward.

A forensic examiner reviewed the calls made from Royal's phone. He testified that the prosecution's experts did a good job analyzing the phone records in this case. However, he opined that several calls made on the morning of May 8, 2007, could not have been made from the diner in Mission Valley. He further opined that it was plausible that another call made that morning could have come from Royal's grandfather's house, but he did not believe it had.

A woman who had an on-again, off-again relationship with Royal from 2005 to 2007 testified that she might have been with Royal on the night of the murder because it was her routine to hang out with Royal on weeknights around that time. However, she was not positive because she could have been broken up with Royal at the time. She denied that Royal asked her to provide him with an alibi during a jail visit on December 16, 2016. Around the time of trial, the woman had recently reconnected with Royal.

<em>Rebuttal</em>

A detective testified that Royal's mother lied to him and told him Royal was not living at her home when he was investigating the shooting of one of Royal's vehicles.

A representative from NASSCO testified that Royal worked as a student pipefitter and a pipefitter trainee. He never worked as an electrician and was twice fired from the job.

DISCUSSION

I

THE PROSEUCTION'S EFFORTS TO SECURE L.N. AS A WITNESS FOR THE
SECOND TRIAL

A.  Royal's Contentions

Royal argues that the prosecution did not exercise due diligence in securing L.N.
as a witness for the second trial.  As such, he claims his Sixth Amendment right to
confront L.N. was violated when the prosecution read the transcript of L.N.'s testimony,
from Royal's first trial, to the jury.

B.  Background

Following R.J.'s death, Detective Susan Fiske spent a substantial amount of time
trying to locate L.N. to interview her about the incident.  However, L.N. would move
whenever Fiske would discover where she was living.  Eventually, in 2013, Fiske was
able to secure an interview with L.N. after she found her in Las Vegas.  L.N. was
cooperative during the interview and "implied that she was going to remain cooperative."

After Fiske's interview of L.N., Stewart was assigned to Royal's case.  It was
Stewart's job to subpoena witnesses for trial.  It took Stewart about a year to locate L.N.
because she was avoiding him.  Apparently, L.N. was reluctant to be involved in the case
because her relationship with Royal had been so destructive.  Nevertheless, Stewart
subpoenaed L.N. for the preliminary hearing and the subsequent proceedings.  Stewart
believed it was the potential consequences of ignoring a subpoena and court orders that
secured L.N.'s participation in the case.

14

Before the first trial began on September 11, 2017, L.N. was informed that the defense was attempting to implicate her in the murder. She immediately became less cooperative. She retained an attorney. However, despite the fact she was living in Nevada, she continued to comply with her subpoenas. Before her testimony in the first trial, she attempted to invoke her Fifth Amendment right not to testify. The trial court found that her testimony would not implicate her in any crimes and made a judicial determination that she had no Fifth Amendment right not to testify. L.N. then testified and was subject to cross-examination.

L.N.'s testimony in Royal's current trial concluded on September 21, 2017. Following the presentation of evidence, on September 29, the jury hung nine to three and announced it was deadlocked. Before declaring a mistrial, the court commented that it was surprised that the jury hung because Royal did an "awful job" testifying.

Immediately following the mistrial, Stewart did not reach out to L.N. It was Stewart's belief that L.N. had been "traumatized" by the trial, and Stewart felt it would be unnecessary to contact her, which could upset her, until the date of the second trial was set. In January 2018, once a retrial date was set, Stewart attempted to contact L.N. He learned that after the trial, L.N. had returned to Las Vegas. Although she was living in another state, she had previously complied with the court's subpoenas while living in Las Vegas.

Stewart checked local police databases before widening his search. He then checked a Nevada database to see the driver's license status of L.N. and her mother. Since L.N. had been staying at her mother's house, he contacted law enforcement in Las

15

Vegas and arranged for them to surveil the residence. A Las Vegas investigator spent several hours conducting surveillance and observed cars registered to L.N. and her mother parked outside the residence.

Stewart used the information gathered by his contact to obtain a subpoena under the interstate compact. On March 14, 2018, about a month before trial would commence, Stewart's contact in Las Vegas spent several hour's watching L.N.'s residence in an attempt to locate her for service. When the investigator went up to the front door, L.N.'s mother and stepfather told him "that she wasn't there, that they didn't know where [L.N.] was, had no way of contacting her and asked him to leave their property." The investigator continued to surveil the residence, but L.N. never appeared. He also continued monitoring the car registered in L.N.'s name, but it seemed that no one was using that car. At Stewart's direction, the investigator in Las Vegas contacted one of L.N.'s ex-boyfriends. The former boyfriend admitted he had recently talked to L.N. However, he claimed he had no way to contact her.

On March 15, 2018, L.N. called the prosecutor. She informed her she did not want to testify at the second trial and refused to divulge her location or accept a subpoena. Stewart did not attempt to secure a "ping warrant" to try to locate her phone.[4]

---

[4] Generally, a "ping warrant" authorizes global position system surveillance of a cell phone. In discussing the lack of a ping warrant here, Stewart indicated that he had never used a ping warrant to locate a witness in a case. Instead, he had only used such a warrant to locate defendants and suspects. The trial court observed that it required "probable cause for a crime" before it would issue a ping warrant. Although he admitted to never asking for a warrant, defense counsel insisted the prosecution could have obtained a "material witness" warrant for L.N.

16

Stewart continued to attempt to locate L.N. He conducted an employment check, but it revealed only a former employer he had already contacted. The check did reveal a mailing address in Bonita at a "Postal Annex-type business." Stewart visited the store, talked to the manager, and asked for any forwarding address on file. The manager provided him with two forwarding addresses. One was the address in Las Vegas that he was already aware of. The second was an address in Georgia.

On March 29, 2018, and again on April 2, 2018, Stewart contacted law enforcement officials in Georgia to ask for assistance locating L.N. He provided Georgian officials with a picture and an address and indicated he would start interstate compact proceedings if they could locate her.

On April 3, 2018, Stewart testified at a pretrial hearing. He had not heard back from his contacts in Georgia. Stewart acknowledged he made no efforts to contact L.N. between September 2017 and January 2018 because there was no "due date for trial." He was similarly concerned that if L.N. knew there was going to be a second trial she would "move to an address where [he] couldn't locate her."

Following Stewart's testimony, the court heard arguments from counsel regarding the prosecution's efforts to locate L.N. In addition to reiterating Stewart's efforts to track down L.N., the prosecutor stated that the first trial "traumatized" L.N. and that she left California before a mistrial was declared. The prosecutor also explained that she did not attempt to serve L.N. with a subpoena before a firm trial date was set because she was concerned that if L.N. had too much "advanced notice" she would flee. Additionally, the

17

prosecutor maintained that the fact that L.N. was located outside of California increased the difficulty of serving her with a subpoena.

In response, Royal's trial counsel argued that the prosecution had to take reasonable precautions to prevent L.N., a "critical" or "vital" witness, from disappearing. Defense counsel pointed out that the prosecution knew that L.N. was "spooked" and had "every reason . . . to keep close tabs on her." Counsel even suggested incarcerating L.N. as "a last option."

After listening to arguments from the parties, the court described the reasoning behind its ruling that L.N. was unavailable. The court expounded:

> "All right. Well, there's no question, I think both parties' preference would be to have her here, there's no question about that, and she was a difficult witness before the first trial, during the first trial and after the first trial, and decisions have to be made, when you know there's going to be a second trial, of 'How do we deal with this difficult witness who now lives in another state?'

> "And Counsel suggested they could have gone through Interstate Compact, but the problem with that is if you know it's not the trial date, then you've given her the heads up. Decisions were made. You can criticize them, but they weren't unreasonable, and that's the standard that we're using.

> "Once we got a firm trial date in April, they pulled out all the stops, including using help from the Clark County DA's Office in order to secure her presence. Quite frankly, she was rather elusive in the sense that all indications indicated she lived in Las Vegas. I mean, that's what everybody thought until she, quite frankly, pulled a fast one, after telling the DA, 'I'm not cooperating,' and all of a sudden she flees to Georgia, which actually is some pretty good police work. They tracked her down to Georgia.

> "Again, everybody's preference would be that she testify. Obviously, the jurors—a cold record is not in anybody's best interest, but the People have exercised due diligence here. The

18

defense had ample opportunity to cross-examine her during the first trial, so based on that I will at this point deem her unavailable with this caveat: That obviously should she become available, that the People let the Court know right away because I think everybody wants her here. So at this point then, based on that, I do find as a matter of law that she is unavailable under [Evidence Code section] 240."

The second trial commenced on April 10, 2018. On April 16, 2018, while L.N.'s testimony was being read to the jury, the prosecutor alerted the court to the fact that L.N.'s attorney contacted her and let her know L.N. wanted to testify. The attorney did not know where she was or when she would be available, and he believed that L.N. appeared to have "some concerns" about immunity and her parents being left alone. The court suggested they keep reading L.N.'s testimony until there was some evidence she would be available.

During a break in the proceedings, the prosecutor again spoke to L.N.'s attorney. The prosecutor then informed the court that the attorney had told her that he believed L.N. "was local" but did not know her exact location. The prosecutor also stated that L.N.'s attorney told her that, in order to testify, L.N. had told him she wanted immunity, her mother to be left alone, and $15,000 to testify at Royal's second trial. The prosecutor relayed to the attorney that she could only offer her the standard compensation of $15 a day, transportation reimbursement, and a meal voucher. When this offer was presented to L.N., she refused to testify.

Following more discussions about this situation, L.N.'s attorney was called to testify at an Evidence Code section 402 hearing. He confirmed that the prosecutor's characterizations of his comments had been correct. The attorney revealed that L.N. was

19

scared and traumatized. He believed she wanted the money, so she could relocate.

Ultimately, L.N. was never located, and her full testimony from the first trial was read into the record at the second trial.

## C. Relevant Law

The confrontation clauses of both the United States and California Constitutions guarantee criminal defendants the right to confront the witnesses against them. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) However, this right is not absolute. (*Chambers v. Mississippi* (1973) 410 U.S. 284, 295.) "An exception exists when a witness is unavailable and, at a previous court proceeding against the same defendant, has given testimony that was subject to cross-examination. Under federal constitutional law, such testimony is admissible if the prosecution shows it made 'a good-faith effort' to obtain the presence of the witness at trial. [Citations.] California allows introduction of the witness's prior recorded testimony if the prosecution has used 'reasonable diligence' (often referred to as due diligence) in its unsuccessful efforts to locate the missing witness." (*People v. Cromer* (2001) 24 Cal.4th 889, 892 (*Cromer*).) It is the burden of the proponent of the evidence to prove unavailability and due diligence. (*People v. Cummings* (1993) 4 Cal.4th 1233, 1296 (*Cummings*).)

We review de novo a court's finding of due diligence by the prosecution in its unsuccessful efforts to locate an absent witness to determine the validity of its subsequent declaration of unavailability warranting an exception to a defendant's constitutionally protected right of confrontation at trial. (*Cromer*, *supra*, 24 Cal.4th at p. 901.) "What constitutes due diligence to secure the presence of a witness depends upon the facts of the

20

individual case. [Citation.] The term is incapable of a mechanical definition. It has been said that the word 'diligence' connotes persevering application, untiring efforts in good earnest, efforts of a substantial character. [Citation.] The totality of efforts of the proponent to achieve presence of the witness must be considered by the court. Prior decisions have taken into consideration not only the character of the proponent's affirmative efforts but such matters as whether he reasonably believed prior to trial that the witness would appear willingly and therefore did not subpoena him when he was available [citation], whether the search was timely begun, and whether the witness would have been produced if reasonable diligence had been exercised [citation]." (*People v. Linder* (1971) 5 Cal.3d 342, 346-347.)

It is settled that the fact "additional efforts might have been made or other lines of inquiry pursued does not affect [a finding of reasonable diligence]. [Citation.] It is enough that the People used reasonable efforts to locate the witness." (*Cummings*, *supra*, 4 Cal.4th at p. 1298; e.g., *People v. Diaz* (2002) 95 Cal.App.4th 695, 706 (*Diaz*); *People v. Lopez* (1998) 64 Cal.App.4th 1122, 1128 (*Lopez*).)

### D. Analysis

The prosecution acted with due diligence in attempting to secure L.N.'s presence at Royal's second trial. Once the date of the retrial was set, Stewart tried to contact L.N. Apparently, sometime near the end of Royal's first trial, L.N. had relocated to Las Vegas. Stewart thus checked local police databases and then checked a Nevada database to ascertain L.N.'s driver license status as well as that of her mother. Because Stewart believed L.N. was staying at her mother's house, Stewart arranged for law enforcement in

21

Las Vegas to surveil L.N.'s mother's house. Stewart obtained a subpoena for L.N. under the interstate compact. About a month before the start of Royal's second trial, law enforcement in Las Vegas spent several hours watching L.N.'s mother's residence, trying to locate L.N. for service of the subpoena. Las Vegas law enforcement contacted L.N.'s mother and stepfather in an attempt to locate L.N. Despite the mother's and stepfather's unwillingness to help, Las Vegas law enforcement continued to surveil the residence and monitor a car registered to L.N. Per Stewart's request, Las Vegas law enforcement even contacted one of L.N.'s ex-boyfriends in Las Vegas to find L.N.

L.N. contacted the prosecutor on March 15, 2018 to inform her that she did not want to testify at Royal's second trial. L.N. also refused to divulge her location or accept a subpoena.

Stewart continued his efforts to locate L.N. He conducted an employment check, which revealed a mailing address in Bonita for a postal annex business. Stewart visited the store and obtained two forwarding addresses for L.N.—one was the address already surveilled in Las Vegas and the other was in Georgia. Stewart then contacted law enforcement in Georgia to ask for help locating L.N. He provided Georgia law enforcement with L.N.'s picture and an address. Stewart also indicated that he would start interstate compact proceedings if L.N. was located.

Royal does not dispute the prosecution's efforts as described. Instead, he argues the prosecutor did not do enough. Most importantly, he posits that it was "reasonably foreseeable" that the result of the first trial would be a mistrial. To this end, he argues the prosecution's case in chief, absent L.N.'s testimony, "was notably weak." He also implies

22

the prosecution should have taken proactive steps, during the first trial, to ensure that L.N. returned for any potential retrial.

We find two primary problems with Royal's argument. First, it is not all that clear on the record before us that a mistrial was reasonably foreseeable. Although we agree that every criminal trial has the potential to result in a mistrial, we note that, below, at least the trial court expressed surprise that the jury hung because of the "awful job" Royal did testifying in his defense. Second, Royal has provided us with no authority that would require a prosecutor, even if a retrial seems probable, to secure important witnesses for a possible retrial during the original trial. And we are not going to establish such a rule on the record before us.

Having not accepted Royal's premise that the prosecutor should have anticipated a mistrial and taken steps during Royal's original trial to secure L.N.'s presence at the second trial, the rest of Royal's arguments lose any merit that they might have had. For example, Royal argues that the prosecution could have incarcerated L.N. as a material witness under section 1332. "Under that section, on an appropriate sworn showing, a trial court may detain a material witness when it finds good cause to believe that the witness will not attend the trial and testify." (*In re Francisco M.* (2001) 86 Cal.App.4th 1061, 1064.) However, such a procedure would have required L.N. to be within the superior court's jurisdiction. Here, L.N. left California before a mistrial was declared. Thus, even had the prosecutor utilized section 1332, any order from the court would have been ineffective. Further, if the prosecutor had attempted to use section 1332 during Royal's first trial, it is not clear that a court would have ordered L.N. into custody because there

would be no actual "criminal prosecution" (beyond the trial at which L.N. had testified) as required under subdivision (a) of section 1332, only the possibility of a retrial.

Similarly, Royal's argument that the prosecution should have videotaped L.N. during the first trial so it could play the videotaped testimony during the retrial is not persuasive. This argument is contingent on the prosecution anticipating both a mistrial and that L.N. would flee California after testifying in the first trial. And Royal has provided no authority showing that the prosecution was required to videotape a witness at trial under analogous circumstances.

Also, we are not persuaded by Royal's argument that the prosecution could have obtained a ping warrant to locate L.N. Royal has offered no evidence that such a warrant is appropriate for witnesses as opposed to suspects. Both the prosecutor and the superior court represented that a ping warrant could only be obtained to find a suspect who is believed to have committed a felony.

Finally, we reject Royal's last argument that the prosecution did not exercise due diligence in attempting to secure L.N. as a witness for the second trial because it did not consider having L.N. testify via teleconference. There is no indication in the record that L.N. was willing to testify by teleconference or that the prosecution was aware of her actual location so as to be able to set up a teleconference.

In short, Royal offers a list of other methods the prosecution could have employed to secure L.N. as a witness for the second trial. These alternative means do not undermine the People's argument here that the prosecution exercised due diligence. (See

24

*Cummings*, *supra*, 4 Cal.4th at p. 1298; *Diaz*, *supra*, 95 Cal.App.4th at p. 706; *Lopez*, *supra*, 64 Cal.App.4th at p. 1128.)

II

HEARSAY STATEMENTS

A.  Royal's Contentions

Royal asserts the trial court prejudicially erred by admitting certain out of court statements from L.N. under the past recollection recorded exception to the hearsay rule. Royal points out that the statements were made in 2013, some six years after the events in question.  He contends the prosecution did not establish that L.N.'s recollection was fresh in L.N.'s mind when she made the out of court statements.  We agree that the trial court erred in admitting these statements, but find such error harmless.

B.  Background

R.J. was killed on May 7, 2007.  L.N. was first interviewed about the incident on September 11 and 12, 2013.  She testified at Royal's first trial on September 20 and 21, 2017.

In the prosecutor's trial brief for the second trial, the prosecutor asked for an in limine ruling that certain statements L.N. made to detectives in 2013 would be admitted under the past recollection recorded exception to the hearsay rule.  At the motion in limine hearing, Royal's trial counsel explained the problems that would stem from admitting some of L.N.'s statements to the detectives as past recollection recorded.  To this end, defense counsel noted that L.N. "says 'I don't remember' to almost everything," adding that "I don't remember" encompassed both authentic memory loss and evasion of

25

answering the proposed question in L.N.'s case. Counsel emphasized that the primary problem was that L.N. was testifying regarding conversations and events that occurred in 2007, but the recorded recollection occurred in 2013 when L.N. finally talked to law enforcement. Defense counsel further pointed out the prosecution, in the first trial, had explained L.N.'s multiple inconsistencies to the jury by claiming that L.N. had a lack of memory, but maintained that she accurately remembered statements from 2007 when she gave her statements to the detectives in 2013. Counsel summed up that the past recollection recorded exception regarding L.N.'s previous statements to law enforcement was "essentially letting the prosecution get around the fact that [L.N.] doesn't remember."

In response, the prosecutor asserted, "There's no case that states there is a time limit on when someone can recall and give a statement about what happened." The trial court stated that it did not disagree with the prosecutor and was inclined to allow the jury to hear the evidence. The court reasoned that as long as the jury had all the information before it, it could decide what memories were accurate. However, defense counsel again emphasized the large gap of time between the events in question (2007) and L.N.'s statements to the detectives (2013). In doing so, counsel represented that he only found cases with gaps of six months, nine months, and a "weird" federal case with a gap of three years. Royal's trial counsel believed it was inappropriate for the trial court to determine that the "underlying statement [was] so reliable that the jury should be permitted to hear it." The court then clarified that it was not determining that the statements were reliable, and that reliability was "a complete jury question." The court further explained that the hearsay rule existed so that witnesses could take the stand and

26

be cross-examined. When defense counsel pointed out that L.N. would be absent from the second trial, the court noted that what was important was that, in the first trial, L.N. had been subject to full and fair cross-examination. The court granted the prosecutor's motion.

During trial, Royal's trial counsel renewed his objection to the admission of L.N.'s 2013 statements to the detectives. In support of his objection, counsel produced a printed copy of L.N.'s prior testimony tabbed with objections to every statement she had made that was admitted pursuant to the past recollection recorded exception. Defense counsel had identified "six or seven" instances where this exception had been invoked.

The parties then began to read through the transcript and defense counsel began lodging other evidentiary objections. When the parties arrived at the past recollection recorded issue, the court indicated the issue "complicated," and the court needed "to actually read through that and get a feel for it." The court stated it was inclined to defer its ruling until after the weekend, so it could consider the law in this area.

Royal's trial counsel then reiterated his belief that the prosecutor had failed to meet the foundational requirement for past recollection recorded. The defense counsel maintained that the prosecutor had asked L.N. during the first trial (in 2017) whether her memory of events had been better in 2013 than they were in 2017. Counsel argued that this question was insufficient to establish the requirement that the events were fresh in L.N.'s mind when she made the statements to the detectives in 2013. The court then asked if defense counsel had any case law stating there was "magical words that have to be spoken in a certain manner" to lay the foundation for the past recollection recorded

27

hearsay exception. Royal's counsel did not have any case to support his position, but instead, pointed to the factors listed in Evidence Code section 1237.

In response to defense counsel's argument, the prosecutor explained that because of L.N.'s limited vocabulary, the court in the first trial had recognized that she "was trying to speak in a simple fashion with the witness so that [she] could and did lay proper foundation."

Royal's trial counsel also argued that it was improper for the prosecutor to make inconsistent arguments about L.N.'s memory. He claimed the prosecutor was arguing to the court that L.N. had a good memory of the incident in 2013, while also arguing to the jury that L.N. did not "remember a lot of specifics from 2013." The prosecutor objected that defense's counsel's representation mischaracterized the evidence. Further, the prosecutor pointed out that she had argued L.N. remembered some things but that there were other "specific details" she could not recall. Just because L.N. could not recall "some parts of an event . . . doesn't mean everything about the event is excluded." After entertaining oral argument, the court did not make a ruling.

The following Monday, when the parties reconvened, the court addressed the issue. The court explained that past recollection recorded was similar in some ways to the business records exception because both involved information recorded "near the time of the event." The court then noted there had been a lot of discussion regarding the six-year gap between the murder and the interview, but that in the first trial the court had expressly found that L.N. had personal knowledge of the events she described in the interview when it admitted the evidence. In response, Royal's trial counsel then reiterated

28

that the prosecutor had not "laid the foundation." The court did not appear to be swayed by this argument, framing the argument as one that the prosecutor did not use "the verbiage from the code." The court also pointed out that since L.N. had been on the witness stand, there had been a full and fair opportunity for cross-examination. The court then reasoned that, following her testimony including cross-examination, L.N.'s credibility was "something for the jury to figure out."

Although he cross-examined L.N. in the first trial, defense counsel argued that the primary issue before the court was whether the prosecutor established that events were "fresh" in L.N.'s mind in 2013 when she made her statements to the detectives. In response, the prosecutor explained that she had established the requirements of Evidence Code section 1237 "over and over." According to the prosecutor, the fact that the witness "remembered things and provided the statement in 2013 meant she remembered it." The prosecutor had asked about the incident at the first trial in 2017. The prosecutor also explained that she had attempted to refresh L.N.'s recollection and had only moved on to the next step of past recollection recorded when that failed.

Defense counsel countered that the prosecutor could not simply "move to the next step." Instead, counsel believed a witness had to be asked "a series of questions" that would establish "four very specific elements that are laid out by the Evidence Code."

The prosecutor then noted an example where she had asked L.N., "at the point you talked to [the detectives] it was closer in time to when this conversation happened in the bedroom?" L.N. had responded, "Yes, it was closer in time." The prosecutor had then followed up that question by asking, "And when you talked to them, you independently

29

remembered that conversation?" L.N. responded, "Yes." After the prosecutor failed to refresh L.N.'s recollection on this point, the court in the first trial had admitted L.N.'s 2013 statement as a past recollection recorded. The court stated that it saw no problem with the trial court's approach to this evidence in the first trial, especially given that some unsophisticated witnesses might not understand questions that quoted statutes verbatim. The court then stated that it thought this exchange showed the prosecutor had laid the proper foundation.

In response, defense counsel pointed to part of the transcript later on, where the prosecutor had simply asked if the interview refreshed L.N.'s recollection and then offered the evidence as a past recollection recorded. The court informed defense counsel that the prosecutor was not required to "redo the foundation" every time she asked a question.

Apparently sensing he was losing the argument, defense counsel then focused on his second argument that the prosecutor was "talking out of both sides of [her] mouth." The court, however, was not convinced, explaining that it was common that a witness might "remember some things and not remember others."

At trial, L.N.'s testimony from the first trial was read into the record. There were many facts regarding Royal and the incident that L.N. was able to recall. There were some facts that L.N. was able to recall after her recollection was refreshed. There were some facts that L.N. was not able to recall that were admitted as past recollections recorded. And there were some facts that L.N. did not know or could not remember. For example, L.N. remembered that Royal had abused and beat her. Similarly, L.N. had no

30

trouble remembering that she had seen Royal arm himself with a shotgun, that Royal had

called her and asked to be picked up at the supermarket on the night R.J. was killed, and

that after she picked up Royal, he admitted he had shot someone.

The first time the past recollection recorded exception was raised, the following

exchange took place:

> "Q.  I want to show you Page 44 of the transcript, specifically Lines 10 through 11.  If you could read that silently to yourself and look up when you're done.  [¶]  Do you remember making that statement to the detectives?
>
> "A.  No.
>
> "Q.  No.  Okay.  When you talked to the detectives, were you being honest?
>
> "A.  Yes.
>
> "Q.  And at the point in time when you talked with the detectives, you would agree that it was closer in time to when the conversation with the defendant happened in that bedroom after he had the shotgun?
>
> "A.  Can you repeat it.
>
> "Q.  Yes.  At the time you talked to the detectives and told them about what the defendant said when you walked in on him with the shotgun—
>
> "A.  Uh-huh.
>
> "Q.  —that was closer in time to when that actually happened, correct?
>
> "A.  I don't understand what you mean closer in time to when it happened.
>
> "Q.  Yeah.  Was it closer in time than today's date?

31

"A. Yes.

"Q. Okay. And when you talked to the detectives, you independently remembered that conversation?

"A. Yes."

Based on the past recollection recorded exception to the hearsay rule, the court admitted evidence that: (1) Royal was upset that someone shot up his car; (2) someone had shot up Royal's Range Rover; (3) Royal told L.N. he needed to go back to the crime scene to get the shotgun; (4) Royal started shaking and said "That's it. That's him" when he saw the news broadcast discussing R.J.'s death; and (5) R.J. begged Royal not to shoot him. Also, on redirect, the prosecutor used the past recollection recorded exception to establish: (a) L.N. tried to move up her meeting with law enforcement; and (b) she delivered gas to Royal on the night of R.J.'s death.

## C. Relevant Law

Hearsay is evidence of an out of court statement offered to prove the truth of the matter asserted therein and is inadmissible unless it falls within an exception to the hearsay rule. (See Evid. Code, § 1200.) Evidence Code section 1237 provides an exception to the hearsay rule based on past recollections recorded. That section states:

> "(a) Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement would have been admissible if made by him while testifying, the statement concerns a matter as to which the witness has insufficient present recollection to enable him to testify fully and accurately, and the statement is contained in a writing which:
>
> "(1) Was made at a time when the fact recorded in the writing actually occurred or was fresh in the witness' memory;

32

("2) Was made (i) by the witness himself or under his direction or (ii) by some other person for the purpose of recording the witness' statement at the time it was made;

"(3) Is offered after the witness testifies that the statement he made was a true statement of such fact; and

"(4) Is offered after the writing is authenticated as an accurate record of the statement.

"(b) The writing may be read into evidence, but the writing itself may not be received in evidence unless offered by an adverse party." (Evid. Code, § 1237.)

A trial court has wide discretion to admit or exclude evidence and the court's ruling in this regard will not be disturbed absent a showing that it exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Geier* (2007) 41 Cal.4th 555, 585.) The defendant bears the burden of showing a clear abuse of discretion by the trial court in admitting evidence. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.)

## D. Analysis

L.N.'s statements to the detectives that were admitted under the past recollection recorded exception to the hearsay rule occurred in 2013. At that time, L.N. told the detectives about statements she allegedly heard Royal say at different times in 2007. Thus, there is about a six year gap between the time Royal made the statements in L.N.'s presence and when L.N. divulged these statements to law enforcement. Royal argues that this six year gap is simply too long to permit the statements to fall under Evidence Code section 1237's exception to the hearsay rule. He further insists that the prosecutor did not

33

properly establish that the statements were "fresh" in L.N.'s mind when she relayed them to the detectives in 2013.

In response, the People counter that there is no requirement under Evidence Code section 1237 that a witness utter " 'magic words' " that a statement was recorded at a time the information was " 'fresh' " in his or her mind.  (See *People v. Miller* (1996) 46 Cal.App.4th 412, 424, fn. 5.)  They also insist that, "[a]lthough a statement admitted under this exception must be made at a time when the fact recorded in writing was fresh in the witness' memory, courts have found the exception to apply in cases where the recorded statement was made weeks, months, or even years after the initial event."  To this end, they claim *People v. Cowan* (2010) 50 Cal.4th 401 (*Cowan*) is instructive.  (See *id*. at pp. 465-466 [listing cases that found the exception to apply after three weeks, six months, ten months, and three years].)  We are not persuaded by either of the People's arguments.

Despite agreeing that Evidence Code section 1237 does not mandate any specific incantation to establish that the fact recorded was fresh in the declarant's mind when the statement was made, we still need to see some indicia of freshness in the record.  Here, we find support for the claim of a lack of freshness in light of the amount of time between when the events occurred (2007) and when the statements were made (2013).  For example, L.N. said she was honest when she talked to the detectives.  She agreed that the conversation with the detectives occurred "closer in time" than the trial to the statements allegedly made by Royal.  And she stated that when she talked to the detectives, she "independently remembered" the conversation with Royal.  None of these statements

34

support a finding that the facts were "fresh" in L.N.'s mind at the time she talked to law enforcement in 2013, six years after the subject events.

The People all but ignore the fact that a six year gap exists between the facts in question (what Royal said in 2007) and when L.N. repeated those alleged statements to the detectives in 2013. They point out that no court has declared such a gap renders Evidence Code section 1237 inapplicable. That said, the People have provided no case where a court had to consider such a lengthy gap in analyzing the admissibility of a statement under Evidence Code section 1237. Indeed, the largest gap of time for that exception under California law in any case cited by the parties is about three months. (*See Cowan, supra,* 50 Cal.4th at pp. 465-466.) And our high court noted a federal case in which a federal court found a three year gap was not disqualifying under the federal corollary to Evidence Code section 1237 (*Cowan*, at p. 466, citing *U.S. v. Senak* (7th Circ. 1975) 527 F.2d 129, 139-142.). Thus, the six year gap here is significantly longer than the gap in any case provided by the parties. Although we stop short of concluding that a six year gap between the incident and the recorded statements is too long under Evidence Code section 1237 as a matter of law, such a considerable gap of time requires a party trying to admit the subject statements to lay a sufficient foundation to show that the incident or facts were "fresh" in the declarant's mind at the time the statements were recorded. And even though the law does not require magic words to lay the proper foundation, when the time between events is so extended (as it is here) there simply needs to be more offered to establish the freshness element. Below, that was lacking; thus, the

35

court abused its discretion when it found the subject statements admissible under the past recollection recorded exception to the hearsay rule.

Having concluded that the trial court abused its discretion in admitting portions of L.N.'s interview with detectives as past recollections recorded, we next must evaluate whether the error was harmless. Although Royal acknowledges that the California Supreme Court has employed the harmless error standard under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*) to evaluate errors in admitting evidence under Evidence Code section 1237 (see *People v. Parks* (1971) 4 Cal.3d 955, 961 (*Parks*)), he claims that *Cummings*, *supra*, 4 Cal.4th 1233 implies that we should apply the more stringent harmless error standard under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*).[5] To this end, Royal focuses on the language in *Cummings* where the court stated: "Admission of evidence pursuant to Evidence Code section 1237 does not impermissibly deny defendants their federal Sixth Amendment or state article I, section 15 constitutional rights to confrontation and cross-examination if the record of the witness's past statement is properly authenticated and the statutorily required foundation for admission is laid." (*Cummings*, at p. 1292, fn. 32.) Based on this portion of *Cummings*, Royal maintains that if a court erroneously admits a statement under Evidence Code section 1237 and the required statutory foundation was not laid then a defendant's constitutional rights of confrontation have been violated. Because such an error involves a constitutional

_____

5    Under *Chapman*, the People must establish that any error was harmless beyond a reasonable doubt. (See *Chapman*, *supra*, 386 U.S. at p. 24.)

dimension, Royal urges us to apply the *Chapman* standard. (Cf. *People v. Fudge* (1994) 7 Cal.4th 1075, 1103.) We do not share Royal's expansive reading of *Cummings*.

In *Cummings*, our high court did not discuss the proper standard for a harmless error review of evidence improperly admitted under Evidence Code section 1237. Rather, the court determined that the trial court did not err in admitting evidence under the past recollection recorded exception to the hearsay rule. (See *Cummings*, *supra*, 4 Cal.4th at pp. 1293-1294.) Thus, having found no error, it did not engage in any harmless error analysis. Accordingly, we cannot rely on *Cummings* for the proposition that the *Chapman* harmless error standard is proper here. (See *People v. Evans* (2008) 44 Cal.4th 590, 599 [cases are authority only for points actually involved and actually decided].)

In the instant matter, we conclude the *Watson* harmless error standard is the proper one to apply. (See *Parks*, *supra*, 4 Cal.3d at p. 961.) Our conclusion is buttressed by the fact that Royal's trial counsel was able to thoroughly cross-examine the subject declarant at trial. Therefore, he was able to probe the bias, lack of recall, evasiveness, and all other matters of credibility of the witness, concerning both the time at which she made her statements and at the time of her trial testimony. Such an opportunity satisfies the requirement of the Sixth Amendment. (See *United States v. Owens* (1988) 484 U.S. 554, 559-560.) And article I, section 15 of the California Constitution requires no more. (See *In re Damon H.* (1985) 165 Cal.App.3d 471, 477.) Moreover, Royal also testified during the trial. Consequently, defense counsel could have asked him directly if he ever made the statements that L.N. claimed he made in her interview with the detectives. In short,

on the unique facts of this case, we do not see the trial court's error in admitting evidence under Evidence Code section 1237 to raise a constitutional issue.

Under *Watson*, Royal must show that it is reasonably probable he would have received a more favorable outcome absent the alleged error. (*Watson*, *supra*, 46 Cal.2d at p. 836.) He has not carried his burden here.

Royal's primary argument that the evidentiary error was not harmless is that the evidence admitted was "vital" for the prosecution. However, this assertion ignores the other evidence properly admitted that supports the conviction. For example, when L.N.'s testimony was read into the record, she testified that she had seen Royal arm himself with a shotgun, that Royal had called and asked to be picked up at the supermarket on the night of the shooting, and that after he was picked up, Royal stated he had shot someone. None of these statements were admitted subject to a past recollection recorded exception to the hearsay rule. Therefore, while it is accurate that some of the statements admitted under Evidence Code section 1237 directly related to the murder, they provided background and context to L.N.'s testimony that Royal had armed himself with a shotgun and then confessed to shooting R.J. Further, Royal's trial counsel had the opportunity to extensively cross-examine L.N. As such, on the record before us, we conclude that Royal did not show a reasonable likelihood the outcome of his trial would have been different.

38

# III

## SCOPE OF CROSS-EXAMINATION

### A.  Royal's Contentions

Royal's final argument is that the trial court denied him his Sixth Amendment right to confrontation when it precluded his trial counsel from cross-examining a prosecution expert witness concerning whether L.N.'s demands for $15,000 and immunity in exchange for her testimony were consistent with the expert's profile of human trafficking victims.

### B.  Background

The trial court declared L.N. unavailable and determined that her prior testimony would be read into the record.  While her testimony was being read to the jury, the prosecutor alerted the court to the fact that L.N.'s attorney contacted her and let her know that L.N. would be willing to testify in exchange for immunity, her mother to be left alone, and $15,000.

The prosecution called a clinical social worker as a sexual trafficking expert.  The expert testified that women who are trafficked and abused commonly suffer from memory loss and disassociation.  The expert also testified that she would expect a human trafficking survivor to be very fearful and to suffer from manipulation and brainwashing. She also opined that such a person could have a brain that was "scrambled."

During a break in the proceedings, defense counsel informed the court of his desire to ask the expert about L.N.'s attempt "to extort the prosecution for her testimony." Counsel believed that the statements would come in as an admission of a party (see Evid.

39

Code, § 1220) and that L.N.'s statements were not hearsay because they qualified as a declaration against interest (see Evid. Code, § 1230). The court, however, was not convinced that the statements were against L.N.'s interest. The court also explained that Royal's most daunting problem is that he did not have any evidence regarding L.N.'s demands to testify.

Moreover, the trial court observed that defense counsel was relying on "the prosecutor repeating what [L.N.'s attorney] said, repeating allegedly what his client said." The court was concerned about "multiple layers of hearsay" and the fact that Royal was "treating that as if [he had] proven it as an absolute fact." The court then denied Royal's request to ask the expert about L.N.'s demands she wanted fulfilled before she would testify.

On cross-examination, the expert testified that it would be "somewhat unusual" for a prostitute to be allowed to see her family whenever she wanted. She also admitted that it would be "very unusual" for a prostitute to hang out with her pimp's parents, go to a casino, go grocery shopping, go to a post office box, and drive around in her mom's car. Royal's trial counsel, however, was not permitted to question the expert about L.N.'s demands.

Later in the trial, the court stated its desire to conduct "a[n] [Evidence Code section] 402 hearing with [L.N.'s attorney]." According to the court, there needed to be "a complete record of what his statements would or would not be." The attorney agreed to testify at an Evidence Code section 402 hearing. At the hearing, L.N.'s attorney testified consistently with the prosecutor's representations of L.N.'s demands.

40

Following the attorney's testimony, the court stated, "I mean, it's kind of hard to not see the relevance and the materiality of this." The parties then discussed at length how the evidence of L.N.'s demands should be presented to the jury. Ultimately, L.N.'s attorney was called as a witness by the defense and testified about L.N.'s three demands. There is no indication in the record that, after the attorney testified, Royal's trial counsel asked for the prosecution's expert to be recalled as a witness or otherwise revisited the issue of the scope of the expert's cross-examination.

## C. Analysis

"An expert witness may be cross-examined about 'the matter upon which his or her opinion is based and the reasons for his or her opinion.' [Citation.] The scope of this inquiry is broad and includes questions about whether the expert sufficiently considered matters inconsistent with the opinion. [Citation.] Thus, an adverse party may bring to the attention of the jury that an expert did not know or consider information relevant to the issue on which the expert has offered an opinion." (*People v. Doolin* (2009) 45 Cal.4th 390, 434 (*Doolin*).) Although the scope of cross-examination may be extensive, it is not boundless. Indeed, the trial court has wide discretion in determining the appropriate scope of cross-examination. (*People v. Lancaster* (2007) 41 Cal.4th 50, 102.)

Here, Royal contends the trial court violated his Sixth Amendment rights by limiting the scope of his counsel's cross-examination of the prosecution's expert witness. The Sixth Amendment affords all defendants the right to confront and cross-examine witnesses against them. (See *People v. Pearson* (2013) 56 Cal.4th 393, 454 (*Pearson*).) The defense is typically given wide latitude to test the credibility of such witnesses, but

41

the trial court may still place reasonable limits on defense counsel's inquiries. (*Id*. at p. 455.) We review the trial court's evidentiary rulings for an abuse of discretion, and the court's exercise of discretion in limiting the scope of cross-examination does not violate the defendant's Sixth Amendment right to confrontation unless " ' "the prohibited cross-examination would have produced 'a significantly different impression of [the witness's] credibility.' " ' " (*Pearson*, at pp. 455-456.)

Below, the trial court prohibited defense counsel from asking the prosecution's expert witness about L.N.'s demands from the prosecution before she would agree to testify. In doing so, the court clearly explained that it was limiting the scope of the cross-examination because there was no admissible evidence of L.N.'s demands. The court pointed out that Royal's trial counsel was relying on "multiple layers of hearsay" because it was the prosecutor who relayed to the court what L.N.'s attorney had said about a conversation he had with his client.

In his reply brief, Royal argues that the court's evidentiary ruling was incorrect under *People v. Sanchez* (2016) 63 Cal.4th 665. Specifically, he relies on the following quote from that case: "An examiner may ask an expert to assume a certain set of case-specific facts for which there is independent competent evidence, then ask the expert what conclusions the expert would draw from those assumed facts. If no competent evidence of a case-specific fact has been, or will be, admitted, the expert cannot be asked to assume it." (*Id.* at pp. 676-677.) Royal contends the verbiage "or will be" supports his position because "[t]here existed little doubt" that evidence of L.N.'s demands would be admitted at trial. In support of this position, however, Royal only points to the fact that

42

L.N. hired an attorney and her attorney informed the prosecutor of L.N.'s demands in order to testify. We fail to see how this argument relates to the lack of evidence of L.N.'s demands at the time defense counsel sought to cross-examine the expert about them.

Royal also claims that L.N.'s demands were admissible as a declaration against interest under Evidence Code section 1230.[6] Nonetheless, this argument overlooks the fact, at that time defense counsel sought to cross-examine the expert regarding L.N.'s demands, the source of L.N.'s demands was the prosecutor. The prosecutor, in turn, became aware of the demands from L.N.'s attorney. Thus, the prosecutor's statement to the court about L.N.'s demands contained multiple levels of hearsay. Royal offers no explanation how the prosecutor's statements about what the attorney told her about L.N.'s demands would have been admissible.

Yet, as the People emphasize, eventually the evidence of L.N.'s demands was admitted into evidence when L.N.'s attorney testified about them at Royal's second trial. Indeed, it was the defense who called the attorney as a witness. Thus, at that point, after the prosecution's expert testified, evidence of the demands was before the jury. Royal's trial counsel, however, did not seek to recall the expert so he could ask her about the impact of L.N.'s demands on the expert's opinions. Having not done so, we agree with

---

[6]     Evidence Code section 1230 provides: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true."

43

the People that Royal forfeited any claim that his rights under the confrontation clause were violated. (See *People v. Lucas* (2014) 60 Cal.4th 153, 330.)

In summary, we conclude the trial court did not abuse its discretion prohibiting the defense from asking the prosecution's expert about L.N.'s demands. Although the scope of the cross-examination is typically broad (see *Doolin, supra,* 45 Cal.4th at p. 434), this principle does not require a trial court to ignore the rules of evidence. Below, the court correctly stated that there was no admissible evidence of L.N.'s demands before it at the time defense counsel sought to cross-examinate the expert about the demands. Later, the demands were offered into evidence. Therefore, the jury heard about L.N.'s demands and could use those demands to evaluate L.N.'s credibility. If at trial, defense counsel believed it was important to ask the expert about these demands, he could have sought to recall the expert and ask her about them. He did not do so. Further, here, Royal does not explain how the expert's failure to testify about the impact, if any, of L.N.'s demands on her opinion " ' "produced 'a significantly different impression of [the expert's] credibility.' " ' " (*Pearson, supra,* 56 Cal.4th at p. 455.) Without such a showing, Royal has not carried his burden of exhibiting that the trial court' exercise of discretion in limiting the scope of the cross-examination of the expert violated the Sixth Amendment. (*Pearson*, at pp. 455-456.)

44

DISPOSITION

The judgment is affirmed.

                                                            HUFFMAN, J.

WE CONCUR:


McCONNELL, P. J.


GUERRERO, J.

Filed 12/10/19

**CERTIFIED FOR PUBLICATION**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE, | D074343 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE361596) |
| MARLIN ROYAL, | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendant and Appellant. | |

THE COURT:

The opinion in this case filed November 26, 2019, was not certified for publication.  It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.

McCONNELL, P. J.

Copies to:  All parties

2